UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**JOHN TRAVIS ALDRICH** and<br>**ALDORA JUNE ALDRICH**,<br><br>Debtors. | Case No. **11-60839-7** |
| **ALBERT STEVEN JUNKERT**,<br><br>Plaintiff.<br><br>-vs-<br><br>**JOHN TRAVIS ALDRICH** and<br>**ALDORA JUNE ALDRICH**,<br><br>Defendants. | Adv No. **11-00054** |

# MEMORANDUM of DECISION
# and ORDER

At Butte in said District this 22nd day of June, 2012.

Plaintiff Albert Steven Junkert ("Steve"), through counsel, commenced this Adversary Proceeding on August 25, 2011. In his Complaint, Steve seeks to quiet title to Tract 2 of Certificate of Survey 3227, and also seeks punitive damages, attorney's fees and immediate turnover and possession of Tract 2 and his equipment located thereon stemming from an alleged breach of contract, breach of fiduciary duty, and actual and constructive fraud. The Defendant/Debtors, John and Aldora Aldrich, counter that Steve's complaint fails to state a claim

1

upon which relief can be granted, that Steve's claims fail for lack of consideration and that Steve's claim as to Tract 2 fails because the parties' oral agreement was not reduced to writing. Debtors also contend that Tract 2 is part of their declared homestead.

After due notice, trial was held April 26, 2012, in Billings. Steve was represented at trial by Jack E. Sands of Billings, Montana and the Defendants were represented by Craig D. Martinson of Billings, Montana. Steve, Kathleen Barnes, Vick Reichenbach, Paul James Jones, Rick Althoff, Aldora Aldrich ("Aldora") and Andrea Aldrich testified; Plaintiff's Exhibits 1 through 12, and Exhibits 15 through 29 and Defendants' Exhibits A through V were admitted into evidence. At the conclusion of the trial, the Court took the matter under advisement. This Memorandum of Decision sets forth the Court's findings of fact and conclusions of law.

## FACTS

Albert and Julia Junkert owned, at one time, approximately 320 acres of real estate located in Huntley, Montana. Julia Junkert passed away in 2000; Albert Junkert passed away in January of 2003. Albert and Julia Junkert had five children: Steve, Aldora, Krista Junkert, Adella Hammerstrom and Allena Junkert.

In 1985, Albert and Julia Junkert deeded 20 acres, from their 320 acre parcel, to Debtors. Debtors currently reside on the 20 acre parcel, which is described as Tract 1 of certificate of survey 3325. For the past 40 to 45 years, Steve has lived on a 19.809 acre parcel of Albert and Julia Junkert's property, identified at trial as Tract 1 of Certificate of Survey 3227. For 35 or so years, Steve operated a gravel and dump truck business on 62 acres of Albert and Julia Junkert's property, identified at trial as Tract 2 of Certificate of Survey 3227. Tracts 1 and 2 of certificate of survey 3227 comprise the northern portion of the 320 acre parcel. Debtors' 20 acre parcel lies

just to the south of Tract 2.

Steve, who is developmentally disabled, graduated from high school, receiving a special education certificate. Julia Junkert, while alive, kept the books for Steve's business and prior to 2003, Steve did not have a checking account in his name. Prior to her death, Julia would invoice Steve's customers, deposit the income from Steve's business into her personal checking account and pay all Steve's bills. Steve testified he has never had a loan in his own name, and Defendants offered no evidence to contradict such statement. When Steve needed a loan for his business, such loans were secured in Julia's name. Julia also oversaw the preparation and filing of Steve's income taxes.

After Julia passed away in 2000, Allena Junkert and Aldora took over Steve's books. They would deposit Steve's business income into their personal checking accounts and would pay Steve's bills from their personal accounts. It does not appear that Steve has filed income tax returns since his mother passed away in 2000.

Pursuant to a Last Will and Testament dated June 6, 2002, Albert provided for the division of his personal assets and his 300 remaining acres. Under the Last Will and Testament, Debtors were not left any property, other than the 20 acres they received in 1985. Debtors' three children (Travis, Alicia and Andrea) were willed a combined sum of 42 acres. Steve was awarded 62 acres per Albert's Last Will and Testament; Allena Junkert was awarded 62 acres, which included Albert's residence; Krista Junkert was awarded 62 acres; and Adella Hammerstrom and her children were awarded a total of 62 acres.

Unfortunately, at the time of his death, Albert's 300 remaining acres were not subdivided,

3

the acreage was encumbered by a mortgage[1] and Albert had other miscellaneous debts.  In an effort to satisfy the mortgage and debts, Albert's Estate sold approximately 65 acres to Gabel Construction, receiving net proceeds of $58,887.00.  The co-personal representatives of Albert's Estate were also contemplating selling additional acreage to Gabel Construction to fully satisfy the mortgage and debts and to pay for the expenses associated with dividing the 300 acres.

A dispute arose between Steve and Albert's Estate over some personal assets, a claim Steve was asserting against the Estate, and a claim the Estate was asserting against Steve for gravel extracted by Steve from the property.  Steve hired an attorney to help him with the dispute.  At some point, Aldora joined Steve in the action against Albert's Estate.  According to Aldora, she wanted to help Steve with his claims and the paperwork.

Even though Aldora did not have a dispute under Albert's Will and even though Aldora allegedly joined the lawsuit to assist Steve with his claims and the paperwork, Aldora also testified that the dispute was always about the real property.  As mentioned above, the co-personal representatives of Albert's Estate were looking for ways to satisfy the Estate's financial obligations.  To that end, the Estate was considering selling the western portion of the 300 acres, lying north of Yellowstone Trail road, to Gabel Construction.  The Estate had already sold Gabel Construction the western portion of the property lying south of Yellowstone Trail.  Thus, had the Estate followed through with its plan, Debtors' 20 acres would be surrounded on three sides by property owned by Gabel Construction.  Aldora opposed the second sale to Gabel Construction and instead wanted to keep the property together, with her children receiving the property

---

[1] The mortgage payments between January 16, 2003, and May 2, 2005, and the final payoff made by the Estate totaled approximately $63,214.00.

surrounding Debtors' 20 acres.

Steve, Aldora and Albert's Estate eventually reached a resolution, which is reflected in the Stipulation identified as Plaintiff's Exhibit 3. As part of the Stipulation dated July 20, 2004, Steve's claim against the Estate was disallowed in full, the Estate's claim against Steve was disallowed in full, and personal property was divided. As for the real property, the parties agreed as follows:

> Aldora and Steven may pursue any of the alternatives that are detailed in Exhibits A through D . . . provided that the cash to the Estate is, at a minimum, the price per acre for the acreage amounts devised to each heir, according to the Co-Personal Representative's calculations, which compensates the Estate for the debts, expenses and costs of the Estate for such acreage amounts, plus the amount of $800 per acre for the acreage amounts not devised to each heir. This amount is approximately $57,800 for the Estate land lying north of Yellowstone Trail. From this amount, Aldora shall be allowed an offset for at least $13,000.00 for amounts that she previously paid to the Estate, according to the financial books of the Co-Personal Representatives.

Two of the four proposals attached to the Stipulation as Exhibits A through D contemplated a sale of the land on the western border of Debtors' 20 acres. The other two proposals would buffer the northern, eastern and western borders of Debtors' 20 acres by requiring Debtors, their children and/or Steve to purchase just over 64 acres north of Yellowstone Trail road.[2] Steve and Debtors' children would secure the remainder of the property located north of Yellowstone Trail through their inheritance. The Court would note that under a fifth counter proposal, Steve would receive approximately 38 acres and Debtors' children could receive 25.5 acres, free and clear, without having to make any payments to the Estate. Debtors, however, did not want that proposal because it called for selling all the property to the north, west and south of Debtors'

---

[2] Debtors' 20 acre parcel is located almost in the center of the original 320 acre parcel, and all but a small corner of the 20 acres is located north of Yellowstone Trail.

property. Debtors similarly opposed the counter proposals identified as Exhibits C and D to the Stipulation, because such counter proposals provided for the sale of all property bordering the western and southern edges of Debtors' property.

The remaining 300 acres was eventually subdivided according to Exhibit A attached to the Stipulation and the Stipulation was finally approved by the Montana Thirteenth Judicial District Court, Yellowstone County on January 27, 2005. A certificate of survey subdividing the 300 acres in accordance with Exhibit A to the Stipulation was attached to the Order approving the Stipulation.

Thereafter, on March 31, 2005, Debtors and Albert's Estate entered into a Contract for the Sale and Purchase of Real Estate, whereby Debtors agreed to purchase all the acreage situated north of Yellowstone Trail, which consisted of approximately 129.3 acres.[3] According to the certificate of survey 3227, the aforementioned acreage was now identified as Tract 1 consisting of 19.809 acres (which included Steve's residence), Tract 2 consisting of 62.00 acres (which included Steve's gravel pit), Tract 3 consisting of 17.306 acres, Tract 4 consisting of 17.306 acres and Tract 5 consisting of 12.853 acres.

Albert's Estate and Debtors agreed on a purchase price of $119,040.00 for the entire 129.3 acres and from the purchase price, Debtors were given a credit for the inheritance Steve, Travis, Alicia and Andrea would have otherwise been entitled and for funds Debtors had already advanced to the Estate. At the time the parties entered into the Contract for the Sale and

---

[3] Yellowstone Trial divides the original 320 acre parcel of real estate almost in half, with Tracts 1, 2, 3, 4, 5 and Debtors' 20 acres situated to the north of Yellowstone Trail, leaving Tracts 6, 7, 8, 9 and 10 to the south of Yellowstone Trail. Tract 9, situated in the southwest corner of the 320 acre parcel and consisting of 65.05 acres, was previously sold to Gabel Construction for $58,887.00.

Purchase of Real Estate, they contemplated that Debtors would need $41,404 to close the sale.

In order to close the sale, as contemplated in the Contract for the Sale and Purchase of Real Estate, Steve, Travis, Alicia and Andrea would have to waive their respective inheritances of $36,863, $8,324, $8,324, and $8,324. In addition, someone would have to secure a loan for the cash required at closing.

As noted earlier, Steve had never secured a loan in his own name. However, Steve did explore securing separate financing for Tracts 1 and 2 from friends and acquaintances. Kathleen Barnes of Huntley testified she has known Steve since approximately 1980 and confirmed that Steve discussed borrowing money from her in 2005. Kathleen testified she was prepared to loan Steve $32,000 to $35,000 in 2005. Steve also talked with Vick Reichenbach in 2005 about borrowing funds. Vick Reichenbach testified he was interested in loaning Steve somewhere in the neighborhood of $30,000 in 2005.

Steve did not follow through with his efforts to secure financing for Tracts 1 and 2. Instead, Steve agreed to waive his inheritance so Debtors could secure financing to close the contemplated purchase. Steve and Debtors agreed that if Steve waived his inheritance, Debtors would purchase Tracts 1 through 5 and as soon as Steve repaid what he owed, Tracts 1 and 2 would be transferred to Steve. Consistent with their oral agreement, Steve waived his inheritance and Debtors secured financing to purchase Tracts 1 through 5 in accordance with the Contract for the Sale and Purchase.

The sale closed on or about May 2, 2005. The settlement statement, consistent with the Contract for the Sale and Purchase of Real Estate, reflects a total purchase price of $119,040. In addition to the purchase price, Debtors paid settlement charges of $687.00, property taxes on

"Parcel II" of $3,609.74 and county taxes from May 2, 2005, to January 1, 2006, of $646.62.[4] From the gross amount due of $123,983.36, Debtors were give a $61,835.00 credit for the inheritances waived by Steve, Travis, Alicia and Andrea. Debtors were also given a credit of $15,801, representing funds previously advanced by Debtors to keep Albert's Estate liquid during the probate period. The balance owed of $46,347.36 was paid with proceeds of a loan from Yellowstone Bank.[5] The sum of the earnest money and the loan is $62,148.36, but of the foregoing amount, $3,609.74 was for property taxes owed on Parcel II, which did not include Tracts 1 through 5 of certificate of survey 3227. Therefore, after subtracting the inheritance waivers and the property taxes for Parcel II, $58,538.62 of the total funds advanced were paid to purchase Tracts 1, 2, 3, 4 and 5. Of the foregoing amount, $1,333.62 was attributable to settlement charges and county taxes, leaving funds due to the Estate of $57,205.00. The Estate apparently incurred its own settlement charges because after expenses of sale, Albert's estate received $57,005.00 in proceeds "from the sale of 64.1 acres (as part of Tracts 1, 2, 3, 4, and 5)" to Debtors.

Steve and Debtors never discussed the exact amount Steve would need to pay in order to secure title to Tracts 1 and 2, but Steve thought he needed to pay approximately $35,000. Steve and Debtors similarly never discussed a repayment plan. Steve understood that he could make payments to Aldora as he had funds available.

---

[4] Debtors gave Yellowstone Bank Tracts 1, 2, 3, 4 and 5 and their separate 20 acres as collateral for the $46,347.36 loan from Yellowstone Bank. Thus, the closing instructions identify Parcel I, consisting to Tracts 1, 2, 3, 4 and 5 of certificate of survey 3227, and Parcel II, identified as "Township 1 North, Range 27 East, P.M.M., Yellowstone County, Montana[.]"

[5] The loan called for 35 monthly payments of $429.75 with a balloon of $41,141.32 on May 1, 2008.

8

Aldora concurs that she has not once told Steve what was owed on the obligation attributable to Tracts 1 and 2.  Aldora, however, testified that the sole purpose of the Yellowstone Bank loan was to allow Steve to purchase Tracts 1 and 2.  The evidence does not necessarily support Aldora's testimony.  Debtors' primary motive when they entered into the Contract for the Sale and Purchase of Real Estate with Albert's Estate was to secure title to Tracts 3 and 4, and preclude Gabel Construction from purchasing said land.  In order to keep the Estate from selling Tracts 3 and 4, Debtors had to agree to purchase Tracts 1 and 2.  The foregoing bears out in the Contract for the Sale and Purchase found at Exhibit 6, which specifically refers to Tracts 1 through 5, and the settlement statement attached to Exhibit 12.  Thus, even though Debtors had advanced $15,801 to the Estate, they could not have secured Tracts 3 and 4 without securing the loan from Yellowstone Bank because the deal with the Estate was, for all intents and purposes, an all or nothing deal that tied Tracts 3 and 4 to the purchase of Tracts 1 and 2.

Aldora concedes Steve made payments of $6,270 toward the Yellowstone Bank obligation and further concedes that at least one payment Steve made is not reflected in the foregoing amount.  Records kept by Aldora also show Steve made payments of $2,500.00 between July 7, 2006, and August 8, 2007 and that Steve made a payment of $1,500 on February 18, 2008.  Aldora was not sure of the nature of the latter payments totaling $4,000.  On October 8, 2008, Steve paid another $400.00 to Aldora and similarly made a payment of $300 to Aldora on November 17, 2008.  Once again, Aldora could not state with any certainty the nature of said payments.

Exhibit 28 is a hand written record kept by Steve of payments he made to Debtors,

including payments totaling $7,945.00 between May 2005 and May 2006. Exhibit 27 shows additional payments of at least $2,220.00 between July 7, 2006, and July 10, 2007.

Steve did not keep accounting records and for at least some period of time between 2000, when Julia passed away, and 2009 or 2010, Aldora was, to some extent, in charge of Steve's records. Unfortunately, Aldora does not have a complete accounting of the funds she received from or on Steve's behalf. Aldora similarly does not have a complete accounting of the bills she allegedly paid on Steve's behalf. To further frustrate matters, Steve opened a checking account for a short period of time, but after it became apparent that Steve was not capable of managing a checking account, the bank asked Steve to close the account.

The parties agree that Steve has not paid Debtors the full amount owed for Tracts 1 and 2. The parties also agree that they had a verbal agreement that Steve would get title to Tracts 1 and 2 as soon as Steve paid the purchase price attributable to Tracts 1 and 2. Steve, however, has never known what he owed to Debtors and the parties at this time have no idea what Steve still owes. Debtors have similarly never informed Steve that he was in default under the terms of the oral agreement. Debtors contend at this time that Steve owes $45,532.01.

In addition to his sporadic payments as discussed above, Steve has attempted over the years to repay Debtors the entire amount owed, but Debtors have refused Steve's offers. For instance, in 2010 or 2011, Steve offered to pay Aldora the full amount owed for Tracts 1 and 2, but Debtors refused to accept any additional payments from Steve. Consistent with Steve's testimony, Vick Reichenbach confirmed that he discussed loaning approximately $30,000 to Steve in 2010 so Steve could pay Debtors and "get his land." Vick Reichenbach testified he was prepared to loan Steve the requested funds in 2010 and would still do so today. Richard Althoff

was also aware of Steve and Aldora's arrangement regarding Tracts 1 and 2. In early 2011, Richard Althoff approached Debtors to see what they could workout for a payoff from Steve. Debtor John Aldrich simply told Richard Althoff "no." Steve has more recently offered to pay Aldora in the neighborhood of $30,000 to satisfy their verbal agreement and secure title to Tracts 1 and 2.

In 2007, Debtors refinanced the Yellowstone Bank obligation, giving only their own 20 acres as collateral. Debtors then transferred Tracts 3, 4 and 5 of certificate of survey 3227 to Alicia, Travis and Andrea. Debtors also formed TAA, LLC in February 2009. The Articles of Organization show Kevin and Alicia Remington as the members of TAA, LLC. Debtors transferred 4 of their acres, and Tracts 1 (19.81 acres) and 2 (62 acres) of certificate of survey 3227 to TAA, LLC on or about February 24, 2010. Aldora testified that Debtors transferred the 4 acres and Tracts 1 and 2 to TAA, LLC to "protect the property."

In February of 2011, TAA, LLC transferred Tract 1 (19.81 acres) to Steve. At this same time, TAA, LLC transferred Tracts 1 and 2 of Certificate of Survey No. 3325 (Debtors' original 20 acres) and Tract 2 of Certificate of Survey No. 3227 (62 acres) back to Debtors.

Debtors filed bankruptcy on April 29, 2011. Debtors list on schedule A real property described as: "Tract 2 of Certificate of Survey No. 3227, Yellowstone County, Montana, according to the official plat thereof on file and of record in the office of the Clerk and Recorder of said county, under Document No. 3324433, and Tracts 1 and 2 of Certificate of Survey No. 3325, Yellowstone County, Montana, according to the official plat thereof on file and of record in the office of the Clerk and Recorder of said county." Debtors filed a Declaration of Homestead in August of 2007 on Tract 1 of Certificate of Survey No. 3325. Debtors contend

they have filed a homestead declaration for their entire 20 acres plus Tract 2 of certificate survey 3227.

Steve's home is located on Tract 1. Steve temporarily left his property from August 2, 2010, to February 1, 2011, to attend an alcohol treatment program. Steve allowed a friend, Kenny, to stay at his home while Steve was away for treatment. Steve anticipated that Kenny would operate the gravel pit during Steve's absence. Debtors, however, would not allow Kenny access to Tract 2 and when Steve returned from treatment in February 2011, he discovered Debtors had posted no trespassing signs and had installed chains across the gates on Tract 2, thereby precluding Steve's access to Tract 2. Steve contacted the authorities, but was advised that he would have to consult with an attorney because title to Tract 2 was in Debtors' name. Debtors have not allowed Steve to operate his gravel business since his return from alcohol treatment.

Steve has a screener plant and other personal property located on Tract 2. Steve was advised by Debtors' attorney in January 2012, that he could remove his personal property from Tract 2. However, given the time of the year, it was impossible for Steve to remove his personal property, including the screener plant, from Tract 2.

As mentioned above, Debtors, through TAA, LLC, caused title to Tract 1 to be transferred to Steve on February 15, 2011. Steve paid the back taxes on Tract 1 in August of 2011, which were delinquent for tax years 2008, 2009 and 2010. Steve testified he also tried to pay the delinquent taxes on Tract 2, but Tract 2 was already the subject of a notice of pending assignment. Debtors eventually paid the back taxes on their property on October 13, 2011, including the tax amount, penalty and interest totaling $1,307.83 for Tract 2. Of the foregoing

amount, $1,107.99 was attributable to the actual tax amount, $24.45 represented fees and penalties and the balance of $175.39 was interest.

While Steve was away for alcohol treatment, Debtors attempted to operate Steve's gravel business by holding themselves out as the new owners of Steve's business and identifying their daughter, Andrea Aldrich, as business manager. Debtors' efforts failed.

## APPLICABLE LAW and DISCUSSION

"Property interests are created and defined by state law." *Butner v. United States*, 440 U.S. 48, 54-55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). Debtors argue that their oral agreement with Steve regarding Tract 2 is not in writing and, therefore, such agreement is not enforceable under MONT. CODE ANN. ("MCA") § 28-2-903(d).[6] The facts of this case fall within the exceptions to the statute of frauds.

In *Hayes v. Hartelius* (1985), 215 Mont. 391, 697 P.2d 1349, the parties entered into an oral contract for the sale of real property and in that case, the Supreme Court of Montana concluded the statute of frauds did not render the oral contract invalid. The Supreme Court of Montana in *Hayes* held that it would "not allow the statute of frauds, the object of which is to prevent fraud, to be used to accomplish fraudulent purposes." *Hayes*, 215 Mont. at 396, 697 P.2d at 1353 (citing *Ryckman v. Wildwood, Inc.* (1982), 197 Mont. 154, 641 P.2d 467; *Hillstrom v.*

---

[6] MCA § 28-2-903 reads in relevant part:

The following agreements are invalid unless the agreement or some note or memorandum of the agreement is in writing and subscribed by the party to be charged or the party's agent:

* * *

(d) an agreement for . . . the sale of real property or of an interest in real property.

13

*Gosnay* (1980), 188 Mont. 388, 614 P.2d 466; and *Farmers Elevator Co. of Reserve v. Anderson* (1976), 170 Mont. 175, 552 P.2d 63). As the Court in *Hayes* explained, "it would be a fraud on the defendant to allow plaintiffs to admit to the contract, and then allow them to avoid its obligations by asserting the statute of frauds." *Hayes*, 215 Mont. at 396, 697 P.2d at 1353.

The Court in *Hayes* also recognized partial performance as an exception to Montana's statute of frauds. *Id*. The sufficiency of acts to constitute part performance can be decided as a matter of law. *Quirin v. Weinberg* (1992), 252 Mont. 386, 393, 830 P.2d 537, 541 (citing *Schwedes v. Romain* (1978), 179 Mont. 466, 472, 587 P.2d 388, 391). For an act to be sufficient to constitute part performance, it "must be unequivocally referable to the contract." *Quirin*, 252 Mont. at 393, 830 P.2d at 541 (quoting *Schwedes*, 179 Mont. at 472, 587 P.2d at 391). In addition, "a court has the power to compel the specific performance of one party to an oral contract for the sale of real property in the case of part-performance by the other party." *Luloff v. Blackburn* (1995), 274 Mont. 64, 68, 906 P.2d 189, 191.

In this case, Debtors and Steve both acknowledge their oral agreement regarding Tracts 1 and 2. In particular, Steve understood that if he paid some undisclosed sum of money to Debtors, he would in return receive Tracts 1 and 2. Debtors never told Steve what he would have to pay or when he would have to make payments. Debtors also never told Steve that he would have to pay interest on the obligation. Debtors have similarly never told Steve that he was in default under the oral agreement.

Based upon the evidence, the Court finds Steve was originally obligated to pay Debtors $39,293.42. The Court reached said number by first looking at the acreage Steve and Debtors sought to receive. In particular, Steve intended to secure Tracts 1 and 2 consisting of 81.809

14

acres and Debtors wanted to secure Tracts 3, 4 and 5 consisting of 47.465 acres. Steve could have received 38.80 acres free and clear under Albert's Will and Debtors' children could have received 26.40 acres free and clear. *See* Exhibit 8, Schedule VII to the Final Account. Thus, the acreage of Tracts 1 and 2 exceeded the acreage Steve could have received free and clear by 43.009 acres, while the acreage of Tracts 3, 4 and 5 exceeded the acreage Debtors' children could have received free and clear by 21.065 acres. The amount paid at closing, excluding the taxes owed on Parcel II, was $58,538.62. Dividing $58,538.62 by the excess acreage of 43.009 and 21.065 renders a cost per acre of $913.61, or $39,293.42 for the excess acreage attributable to Tracts 1 and 2 and $19,245.20 for the excess acreage attributable to Tracts 3, 4 and 5.[7] Debtors also paid the 2008, 2009 and 2010 property taxes, including penalties and interest, of $1,307.83 for Tract 2. Adding the $39,293.42 owed on the Yellowstone Bank loan and the property taxes of $1,307.83, the Court finds Steve owed Debtors $40,601.25.

The Court also finds Steve paid Debtors $7,945.00 between May 2005 and May 2006. Steve made additional payments totaling $2,500.00 between July 7, 2006, and August 8, 2007, and thereafter made a payment of $1,500 on February 18, 2008, a payment of $400.00 on October 8, 2008, and a payment of $300.00 on November 17, 2008. In other words, Steve made payments totaling $12,645.00. Steve's payment of $12,645.00 to Debtors constitutes partial performance of the oral contract. Since 2010, Steve has tried to pay Debtors additional sums of

---

[7] Debtors advanced $15,801.00 to Albert's Estate, which amount is reflected on the settlement statement at Exhibit 12 as earnest money. Applying all the earnest money to Tracts 3, 4 and 5 would leave a balance owing at closing of $3,444.20 on Tracts 3, 4 and 5. Debtors also owed taxes of $3,609.74 on Parcel II. Parcel II is separate from Parcel I, which consists of Tracts 1, 2, 3, 4 and 5. Thus, the Court would agree that $39,293.42 of the Yellowstone Bank loan was incurred in connection with Tracts 1 and 2.

money, including the entire amount still owing, but Debtors have refused Steve's offers of payment.

The Court concludes that Debtors and Steve had an oral agreement that is enforceable under Montana law. Steve has tried to fulfill his obligations under the oral contract, but his efforts have been thwarted by Debtors. Thus, the Court finds that Debtors shall, upon Steve's payment of $27,956.25, transfer Tract 2 to Steve.

In addition to the foregoing, F.R.B.P. 7015 applies Fed.R.Civ.P. 15(b) in adversary proceedings. Rule 15(b) provides for amendments to conform to the evidence and states in pertinent part: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Applying the foregoing, the Court concludes that even if the oral agreement between Steve and Debtors was invalid under the statute of frauds, Debtors would nevertheless be holding Tract 2 in a constructive trust for Steve's benefit.

MCA § 72-33-219 provides:

> A constructive trust arises when a person holding title to property is subject to an equitable duty to convey it to another on the ground that the person holding title would be unjustly enriched if he were permitted to retain it.

As the Montana Supreme Court explained in *In re Marriage of Moss*, 293 Mont. 500, 506-508, 977 P.2d 322, 326 - 327 (1999), MCA § 72-33-219,

> affected the law relating to constructive trusts by making constructive trusts dependent upon, and related to, the equitable principle of unjust enrichment. *See Lawrence v. Clepper* (1993), 263 Mont. 45, 53, 865 P.2d 1150, 1156. More to the point, § 72-33-219, MCA, by its plain language, does not require a party seeking to impose a constructive trust to prove that the party who holds title to the property obtained title by fraud or other wrongful acts. Rather, a person seeking to impose a constructive trust on property must only prove that the title holder would

be unjustly enriched if they were permitted to retain title. Thus, as stated in the comments to the Restatement section from which § 72-33-219, MCA, was drawn:

> A constructive trust is imposed not because of the intention of the parties but because the person holding the title to property would profit by a wrong *or would be unjustly enriched if he were permitted to keep the property.*
>
> Restatement of the Law of Restitution, § 160, Comment *b* (1937) (emphasis added). *See also* George T. Bogert, Trusts § 77 at 287 (6th ed.1987)(stating "[w]henever equity finds that one has title to property, real or personal, originally acquired by any kind of wrongdoing *or, although innocently obtained, now held under such circumstances that retention of the title will result in unjust enrichment*, equity may declare such title-holder to be the trustee of a trust constructed by it for the purpose of working out justice, which is merely a convenient means of remedying a wrong.")(emphasis added).

The RESTATEMENT OF RESTITUTION § 1 cmt. c, clarifies that:

> The mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor. Thus, one who improves his own land ordinarily benefits his neighbors to some extent, and one who makes a gift or voluntarily pays money which he knows he does not owe confers a benefit; in neither case is he entitled to restitution.

Aldora testified that Tract 1 should have gone to Steve from the outset and that it was a mere oversight that Tract 1 was included in the March 31, 2005, Contract for the Sale and Purchase. Aldora's testimony on this point is consistent with the evidence that Steve could have received 38 acres free and clear under Albert's Last Will and Testament. Under such scenario, Steve should have received all of Tract 1, consisting of 19.809 acres, and 18.191 acres of Tract 2 (38-19.809). In addition to the 18.191 acres that Steve should have received free and clear from Tract 2, he has paid $12,645.00 toward the remaining 43.809 (62-18.191) acres of Tract 2. If Debtors were allowed to retain Tract 2, in addition to Steve's payments of $12,645.00, they would be unjustly

enriched. Therefore, the Court once again concludes that upon Steve's payment of $27,956.25 to Debtors, that Debtors shall be required to transfer Tract 2 to Steve. Steve's right to pay Debtors $27,956.25 and secure title to Tract 2 does not exist in perpetuity. The Court would direct that Steve pay Debtors, or the Trustee if appropriate, the sum of $27,956.25 within 60 days of the date of the Court's judgment. In accordance with the foregoing,

IT IS ORDERED that the Court will enter a separate judgment in favor of Plaintiff Albert Steven Junkert and against Debtor/Defendants John Travis Aldrich and Aldora June Aldrich; and upon Albert Steven Junkert's payment of $27,956.25 to Debtors, or the Trustee if appropriate, within 60 days of this date, Debtors shall quitclaim Tract 2 of certificate of survey 3227 to Plaintiff Albert Steven Junkert.

BY THE COURT

/s/ Ralph B. Kirscher
HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana